SUSIE WELLS, Administratrix of Estate of FLOYD
    WELLS, v. JAMES C. DAVIS, Federal Agent, Ap-
    pellant.

### Division One, April 7, 1924.

1. **PARTIES:** Proper Plaintiff: Foreign Administratrix: Death of
   Son: Damages. The administratrix, appointed by the proper pro-
   bate court of Arkansas, to administer the estate of her deceased son,
   who at the time he was killed was a resident of and engaged in
   interstate commerce in that state, is authorized by the Federal
   Employers' Liability Act to bring and maintain an action, for
   damages resulting from his negligent death, in the courts of this
   State, against the interstate railroad company by which he was em-
   ployed and by which he was killed. For the purposes of such an
   action that act, which is universal in its application, is a statute
   of this State, as much so as it would be had it been enacted by the
   General Assembly, and it authorizes the legal representative of
   deceased to bring the suit, and gives to Federal and State courts
   concurrent jurisdiction of the cause of action; and such being the
   effects of that act, Section 1163, Revised Statutes 1919, declaring
   who may maintain a suit upon a cause of action accruing in an-
   other state, does not determine or govern the right of the adminis-
   tratrix to maintain an action under said act.

2. ———: ———: ———: ———: ———: Assets of Estate: Trust
   Fund. A cause of action for damages due to the negligent killing
   of deceased is not assets of his estate, is not subject to the claims
   of his creditors, but is for the exclusive benefit of the persons
   designated as beneficiaries by the law which creates the cause,
   and a statute giving to his personal representative the right to
   sue makes of such legal representative a trustee of an express
   trust. Therefore, the general rule that an administrator cannot
   sue in his representative capacity in a state other than that in
   which he was appointed has no application to an action brought
   under the Federal Employers' Liability Act in a State court by a
   foreign administrator to recover damages for the negligent killing
   of an employee of an interstate railroad company who at the time
   he was killed was engaged in interstate commerce.

3. **NEGLIGENCE:** Death of Fireman: Moving Engine Without Warn-
   ing: Demurrer to Evidence. A freight train was sidetracked to per-
   mit a passenger train to pass. The engine had two sets of grates,
   and under each was an ash pan. One pan was just to the rear of
   the rear driver wheel; the other was reached by inserting a shaker-

bar between the two rear wheels, or by inserting the bar through the spokes of the next to the rear wheel. The fireman asked the engineer if there was time to clean the grates and empty the pans; being told there was, he shook the grates, and then descended to the ground on the left side of the engine, and went to work emptying the rear pan; using the shaker-bar to loosen the cinders and ashes. The engineer also descended, and with the clinker-hook proceeded to empty the front pan. When the ashes filled the space between the bottom of the rear pan and the ground, and it became necessary to move the engine in order that the remaining cinders might be let out, the fireman asked the engineer whether he should move the engine himself or whether the engineer would move it. The engineer said he would move it, and the fireman stepped back three or four feet from the engine, and stood holding one end of the shaker-bar, the other end resting on the ground. The engineer, passing between the engine and the fireman, climbed into the cab of the engine, which was on the right-hand side, from which he could not see the fireman. About a minute after he entered the cab he started the engine, and it pulled forward four or five feet, and stopped. He did not ring the bell or sound the whistle, and testified that when there is no fireman on the engine it is the duty of the engineer to ring the bell. After stopping the engine, the engineer got out of the cab, and saw the fireman lying on the ground, about opposite the third wheel, the shaker-rod at his feet. There was a bruised place three or four inches wide on the side of his head, and a blue dented spot on his forehead. The shaker-rod was slightly bent at a point about a foot from the end used in poking the cinders, and there was a fresh mark on the engine frame between the pan and the wheel, and also bruised marks on the under side of two or three spokes of the third wheel, and these marks were about a foot from the mark on the frame. One rule of the company read: "A train must not start until the proper signal is given." Another rule read: "The engine bell must be rung when an engine is about to move." *Held*, that the court did not err in overruling defendant's demurrer to the evidence.

4. ———: ———: ———: Violation of Rules: Instruction: Abandonment of Allegation: Substitution of Common Law Duty: Demurrer to Evidence. The fireman, standing on the ground, had been removing cinders from the ash pan with a shaker-bar. When the space between the pan and the ground became filled and it was necessary to move the engine in order to let out the cinders remaining in the pans, the engineer climbed into the cab and after about a minute moved the engine a few feet, without ringing the bell or sounding the whistle, and thereby the shaker-bar was caught by the sudden revolution of the wheels and struck the fire-

man on the head. Rules of the company declared that "a train must not start until the proper signal is given" and that "the engine bell must be rung when an engine is about to move." The petition charged that the injury to the fireman was directly caused by the negligence of the engineer in suddenly opening the throttle and applying the steam without first giving warning either by bell or whistle "in direct violation of law, and in direct violation of the rules of said railway company." Defendant's demurrer to the evidence was overruled. Plaintiff's instruction required the jury to find that it was the duty of the engineer to give warning by bell or whistle before moving the engine, and that the fireman had a right to expect and did expect that such warning would be given, but did not specifically require them to find that the rules were violated or that such violation constituted negligence. Defendant's given instructions told the jury that if the injuries received by the fireman were not the direct result of the failure of the engineer to sound the whistle or ring the bell before starting the engine, their verdict must be for defendant; that the burden was on plaintiff to show that the fireman did not know that the engine was to be moved in the manner it was moved; and that if the fireman had no reason to expect the engineer to give a warning bell or whistle before actually moving the engine, the verdict must be for defendant. Defendant insists that plaintiff's instruction abandoned the allegation that the failure to sound the whistle or ring the bell was in violation of the rules and did not submit that issue, but submitted the case solely on the question whether there was a breach of the common-law duty to warn by bell or whistle, and that the sufficiency of the evidence to sustain the verdict must on appeal be considered on that theory alone. *Held*, that defendant's instructions presented separately and conversely the essential questions set forth conjunctively in plaintiff's instruction, and that all the instructions and all the evidence must be considered together, and when taken together the instructions fairly submitted to the jury the question, made by the allegation, whether the sudden movement of the engine was in violation of the rules, and whether under the circumstances the fireman had a right to expect and did expect that the engineer would give warning by bell or whistle before moving the engine.

5. ———: **In Place of Safety: Presumption.** Where the fireman was standing on the ground, in a place of safety, three or four feet from the engine, with one end of a shaker-bar in his hand and the other resting on the ground, which he had been using in removing cinders from the ash pan, and had requested the engineer to move the engine, whether the engineer was warranted in presuming that the fireman would not suddenly and without manifestation of his intention to change from his position of safety to one of danger by

Wells v. Davis.

again using the bar to remove the cinders, depends upon whether it was the known duty of the engineer before moving the engine to give warning by bell or whistle, and upon whether the fireman had reason to expect such warning signal would be given; and where the rules required that a train must not start until a signal is given and that the engine bell must be rung when the engine is about to move, and the engineer testifies that in the absence of the fireman from the cab it was his duty to ring the bell or sound the whistle, and that he did neither, but started the engine a minute or two after climbing into the cab, it cannot be conclusively presumed that there was no known duty to warn, or reason to expect that the engine would be moved without warning, but the issue was properly submitted to the jury.

6. ———: Precaution. The application of the rule that it is not negligence to fail to take precautionary measures to prevent an injury, which if taken would prevent it, where the injury could not reasonably have been anticipated and would not have happened except in exceptional circumstances, depends upon the circumstances of the particular case. If the precautionary measure is one regularly required, and therefore to be expected before the doing of the act which results in the injury, the rule that the omission of the precautionary measure is not negligence does not apply.

7. ———: ———: Knowledge of Danger: Warning. The rule that a failure to warn is not negligence as to one who knows the danger has no application where there is substantial evidence that the injured person did not know danger was impending.

8. ———: Rules: Warning: Interpretation by Court: Change of Position on Appeal. Where the rules of the railroad company were short, positive and apparently unequivocal in requiring warning by bell or whistle before the train engine was moved, and their force and effect, and the interpretation put upon them by the engineer, whose negligence in suddenly moving the engine without warning it is charged directly caused the fireman's injury, were submitted to the jury, along with an instruction asked by defendant telling the jury that if the fireman knew or had no reason to expect that the engineer would give him warning before moving the engine plaintiff could not recover, the question of the interpretation of the rules is not for further consideration.

Headnote 1:  Death, 17 C. J. secs. 40, 112, 116, 117:   States, 36 Cyc. 832.  Headnote 2:   Death, 17 C. J. secs. 117, 58;  Executors and Administrators, 24 C. J. sec. 2707.  Headnotes 3, 5 and 6:   Master and Servant, 26 Cyc. 1474, 1156, 1168.  Headnote 4:   Master and Servant, 26 Cyc. 1493, 1494;  Trial, 38 Cyc. 1777, 1779.  Headnote 7:   Master and Servant, 26 Cyc. 1170;  Negligence, 29 Cyc. 475.  Headnote 8: Appeal and Error, 3 C. J. sec. 618.

Appeal from Lawrence Circuit Court.—*Hon. Charles L. Henson,* Judge.

AFFIRMED.

*W. F. Evans* and *Mann & Mann* for appellant.

(1)   The deceased when killed was engaged jointly with defendant in interstate commerce.   The action for his death is under the Federal Employers' Liability Act. That act being exclusive, plaintiff has a cause of action under it, or none at all.   Plaintiff sues in her representative capacity, as she necessarily must under the act, having been appointed as administratrix of the estate of deceased by the Probate Court of Crawford County, Arkansas.   Both she and deceased were residents of Arkansas. We have then the situation where a foreign administratrix comes into this State and here brings her suit on a cause of action arising under the laws of the United States—a right not granted her, as we contend, by the laws of this State.   Prior to the Act of 1905, Laws 1905, p. 95, now Sec. 1163, R. S. 1919, a foreign administratrix could not sue in the courts of Missouri.   Casey v. Hoover, 197 Mo. 62, 68; Miller v. Hoover, 121 Mo. App. 568; Lee v. Mo. Pac. Ry. Co., 195 Mo. 400, 420; Schueren v. Railroad, 192 S. W. 966.   By the amendment of 1905 a foreign administrator was given the right to sue in the courts of Missouri on certain causes of action.   Sec. 1163, R. S. 1919.   The Federal Employers' Liability Act being an Act of Congress, applying uniformly among all the states, is a law of the United States and not a law "of any (other) state or territory."   Section 1163, defining the rights of a foreign administrator to sue in this State on causes of action arising under the laws of another state or territory, by every rule of statutory construction, excludes the right to sue on a cause of action not provided for by the statute.   Sec. 7058, R. S. 1919.   This statute expressly provides that the words "state" shall not include the United States.   Greer v. Railroad Co., 228 S. W. 454; Schueren v. Railroad, 192 S. W. 965.   The Federal Em-

ployers' Liability Act does nothing more than to confer concurrent jurisdiction on the courts of the several states when the action is "brought in any state court of competent jurisdiction." The act "instead of granting jurisdiction to the state courts, presupposes that they already possessed it." Mondou v. Railroad Co., 223 U. S. 1, 56 L. Ed. 327, 349. Congress can confer the right to a state court of competent jurisdiction to determine actions arising under the act, but cannot confer compulsory jurisdiction on state courts. Loftus v. Penn. Ry. Co., 140 N. E. 94; Walton v. Prior, 276 Ill. 563; Commonwealth v. International Harvester Co., 131 Ky. 551, 115 S. W. 703. (2) The court erred in overruling defendant's demurrer to the evidence. Plaintiff's petition charges negligence in that defendant failed to warn deceased, before moving the engine, by either bell or whistle and in direct violation of the rules of the railway company. However, plaintiff is bound by her trial theory as shown in her Instruction 1, by which she attempted to cover the entire case and direct a verdict upon the finding as set forth therein. The rule, the violation of which the plaintiff complains of as negligence, required only the bell to be rung. Plaintiff submits her case on the common-law negligence of the failure to ring the bell or blow the whistle, and not on the violation of the rule. The alleged violation of the rule cannot be complained of by plaintiff because: first, she is bound by her trial theory wherein she abandoned the violation of the rule as negligence, and submitted the case solely on the question of whether or not there was a breach of the common-law duty to warn by bell or whistle. O'Hara v. Gas Light Co., 244 Mo. 395, 403; White v. Pierce, 213 S. W. 512; Delano v. Roberts, 182 S. W. 773. The violation of the rule was not submitted as negligence. It cannot be assumed merely from the fact that plaintiff offered a rule in evidence that such was a rule of the company, that it was in force and applicable to that situation, or that it was violated. The jury must necessarily find these facts, neither of which were submitted by plaintiff's instruction. (a) The interpretation of the rule by the engineer shows that this

rule did not require the bell to be rung where the engine was to be moved only four or five feet; that it was not for the protection of the fireman, and that it did not require the engineer to ring the bell—that was the fireman's duty. It is the only construction placed on the rule by the evidence, and by it plaintiff is bound. (b) A determination of whether there was a duty resting on the engineer to warn deceased before moving the train must be founded on the solution of the question, whether under the circumstances confronting the engineer at the time he moved the engine, he saw, or had reason to believe that his fireman would be in a place of danger, made so by the movement of the engine. The engineer's testimony, is that it was at the request of the deceased that he moved the engine; that immediately after the request was made he dropped the bar with which he was working, passed the fireman, who moved back against the rail of the main line track to a place of safety, and climbed upon the cab and set the engine in motion immediately. It was less than a minute, according to his rough estimate, from the time the request was made until the engine was set in motion. The fireman had taken the position that would lead any reasonable man to believe that he stood there waiting for the train to be moved before resuming his work. (c) The engineer was warranted in acting upon the presumption that the deceased, having requested the train to be moved, and having taken a position of safety away from the engine, would not suddenly and without any manifestation of such an intention, change his then position of safety into one of danger, before or while the train was being moved. Maginnis v. Railroad, 268 Mo. 667, 675; King v. Railroad, 211 Mo. 1, 13; Dyrcz v. Railroad, 238 Mo. 33, 47; Guyer v. Railroad, 174 Mo. 344, 351; Degonia v. Railroad, 224 Mo. 564, 599. (d) It is not negligence to fail to take precautionary measures to prevent an injury, which if taken would have prevented it, when the injury could not reasonably have been anticipated, and would not have happened except under exceptional circumstances. The conduct of the engineer is to be measured, not by subsequent events, but by the facts and cir-

cumstances confronting him at the time he moved the engine. State ex rel. Lusk v. Ellison, 271 Mo. 463, 473; Fuchs v. St. Louis, 167 Mo. 620, 645; American Brewing Assn. v. Talbot, 141 Mo. 674, 683; Zasemowich v. Am. Mfg. Co., 213 S. W. 803. (e) The failure to warn is not, as to one who knows the danger, negligence. Gubernick v. Railroad, 217 S. W. 34; Murray v. Transit Co., 176 Mo. 183, 189; Peterson v. Railway, 270 Mo. 67; Hutchinson v. Railway, 195 Mo. 546; Pope v. Railway, 242 Mo. 232, 238; Woods v. Railway, 187 S. W. 12; Lynch v. Gas Light Co., 223 S. W. 111; Harper v. Terminal Co., 187 Mo. 575, 586.

*Sizer & Gardner* for respondent.

(1) Regardless of rules adopted by the company, the common law is that when it becomes necessary to disturb or move a locomotive, in or about which persons are engaged, it is the duty of the company moving it to warn those at or about it of the contemplated movement, in time for them to give heed to their safety. Koerner v. Car Co., 209 Mo. 141; Gayle v. Car & Foundry Co., 177 Mo. 427; Ryan v. Railroad, 115 Fed. 197; Butler v. Railroad, 155 Mo. App. 287; Johnson v. Brick & Coal Co., 276 Mo. 42; Black v. Mo. Pac. Ry. Co., 172 Mo. 177; Railroad v. Shaw, 116 Fed. 621; Jacobson v. Railroad, 41 Minn. 206. (2) A well-established custom or practice has the same effect as a rule, and the violation of either a rule or such custom or practice constitutes negligence. Enloe v. Car & Foundry Co., 240 Mo. 443. (3) The duty, violation of which constitutes negligence, may arise in several ways; it may be created by common law from the relation of the parties, or by statute, ordinance or contract. And in this case the written rules, being in the nature of a contract between deceased and appellant, created a positive duty, the violation of which constituted negligence. 29 Cyc. 424, A. (4) The presumption is, that a duty fixed by law, rule or custom will be discharged in due form, and every one to whom such duty is owing has a right to assume that it will be performed. 20 R. C. L. p. 117, sec. 101. Deceased had the right to go on the assumption that all precautions required by the established rule of appel-

lant would be taken. Railroad v. Maroney, 170 Ill. 520; Railroad v. Richardson, 66 Ind. 43, 32 Am. Rep. 94; Lyman v. Railroad, 66 N. H. 200, 11 L. R. A. 364; Beisiegel v. Railroad, 34 N. Y. 922, 90 Am. Dec. 741; 20 R. C. L. p. 117, sec. 101. (5) The common-law rule forbidding a foreign administrator to sue, had its origin in the protection of creditors, and dealt only with the administration of assets of the estate. It does not apply to actions in which creditors were not interested and where the funds or amounts sought to be recovered are no part of the assets of the estate, but go to designated beneficiaries. Leake v. Gilchrist, 13 N. C. 73, 85; 24 C. J. 1130, sec. 2703; McCarty v. Railroad, 62 Fed. 437; Dennick v. Railroad, 103 U. S. 11; Pearson v. Railroad, 286 Fed. 429; Kelley v. Railroad, 141 Mo. App. 490, 494. (6) In such case the administrator sues not for the benefit of the estate, but as the trustee of an express trust; and not by virtue of his appointment as such administrator, but because the statute creating the cause of action designates him as the proper party to maintain the action. Boulden v. Railroad, 205 Pa. 264; Public Service Electric Co. v. Post, 257 Fed. 933; Pisano v. Shanley, 66 N. J. L. 1; Pearson v. Railroad, 286 Fed. 429; Stoeckman v. Railroad, 15 Mo. App. 511; Railroad v. Babcock, 154 U. S. 190, 38 L. Ed. 958. (7) Appellant's general demurrer followed by their instruction inviting the verdict now complained of estops appellant from saying now that there is no liability. Torrence v. Pryor, 210 S. W. 430; Ramsey v. Railroad Co., 253 S. W. 1081; Leahy v. Winkle, 251 S. W. 483.

LINDSAY, C.—The plaintiff, Susie Wells, brought this suit as administratrix of the estate of her deceased son, Floyd Wells, to recover damages for his death, alleged to be due to the negligence of defendant. His death occurred on December 2, 1922, at Woolsey, Arkansas, while he was employed by the Director General of Railroads as locomotive fireman of an interstate freight train of the St. Louis-San Francisco Railway Company, running from Monett, Missouri, to Ft. Smith, Arkansas. He

was a single man, and had been contributing to the support of his mother, who is a widow. Both of them were residents of Arkansas at that time, and plaintiff is now. Her appointment as administratrix was made by the Probate Court of Crawford County, Arkansas. This suit was filed and tried in the Circuit Court of Lawrence County, Missouri. There was a verdict for $15,000. The trial court remitted $5000, and entered final judgment for plaintiff for $10,000.

I. The first question on appeal duly raised by defendant, is directed at the right or legal capacity of the plaintiff to sue in the Missouri court, under her appointment as administratrix in Arkansas. It is conceded that the action is one under the Federal Employers' Liability Act; and it is therefore a suit by a foreign administratrix, upon a cause of action arising under the laws of the United States, and not under the laws of the State of Arkansas. Defendant insists that the plaintiff is not authorized to sue here by the terms of Section 1163, Revised Statutes 1919; that said Section 1163 is exclusive of any such authority, and that there is nowhere else any authority under which she is entitled to maintain this suit in the courts of this State. Section 1163 took its present form in 1905 (Laws 1905, p. 95) as an amendment of Section 548, Revised Statutes 1899. It is as follows:

"Whenever any cause of action has accrued under or by virtue of the laws of any other state or territory, and the person or persons entitled to the benefit of such cause of action are not authorized by the laws of such state or territory to prosecute such action in his, her, or their own names, then, in every such case, such cause of action may be brought and prosecuted in any court of this State by the person or persons authorized under the laws of such state or territory to sue in such cases. Such suits may be brought and maintained by the executor, administrator, guardian, guardian *ad litem,* or any other

person empowered by the laws of such state or territory to sue in a representative capacity.''

The defendant insists that the word ''state'' as used in this section is to be construed as provided in Section 7058, Revised Statutes 1919, and that this excludes the words ''United States.'' The pertinent portions are as follows:

''The construction of all statutes of this State shall be by the following additional rules, unless such construction be plainly repugnant to the intent of the Legislature, or of the context of the same statute: . . . fifth, the word 'state' applied to any of the United States, shall include the District of Columbia and the territories, and the words 'United States' shall include the said district and territories.''

Thereupon the contention is that Section 1163 not only does not authorize plaintiff to sue, but must be construed as an express exclusion of her right to sue as she has done.

At common law no action lay for damages caused by the death of a human being by the wrongful or negligent act of another, in favor of the heirs or personal representative of the deceased. This was uniformly held and to that effect many Missouri decisions are cited in Gilkeson v. Railroad, 222 Mo. 185. The right of action was first given in England under the statute known as Lord Campbell's Act (9 & 10 Vict.). The provisions of this statute with the various modifications have been incorporated into the legislation of perhaps all of the states in this country. The first similar statute in Missouri, the beginning of our present Damage Act, was enacted in 1855, Revised Statutes 1855, vol. 1, p. 647; The statutes of the various states differed somewhat in the designation of the beneficiaries, and of the person entitled to sue. In 1884, when the case of Vawter v. Mo. Pac. Railroad Co., 84 Mo. 679, was decided, there was no statute of this State permitting an administrator to sue for the death of the intestate caused by the negligent act of another, and it was held that a statute of Kansas

giving such right of action did not authorize an administratrix, appointed in Missouri, the right to sue in this State, for the death of her intestate husband who was killed in Kansas through the negligence of the defendant, although the statute of Kansas gave such right of action to the administratrix, and also permitted a foreign administrator to sue in that state for the death of his intestate, if the law of the state from which he got his appointment gave him like powers.

In 1891 (Laws 1891, p. 68) there was enacted the section which was the original of Section 1163. The Act of 1891 provided for the prosecution in this State of an action accruing under the laws of any other state, or territory, by a person to be appointed by the court wherein the suit was filed. This provision was held to be ineffective and void in McGinnis v. Mo. Car & Foundry Co., 174 Mo. 225, in so far as it undertook to give the person so appointed power to prosecute an action, which under the law of the other state (Illinois) provided that such action should be prosecuted by the personal representative of the deceased person. It was said that the administrator of such person could not prosecute the action in this State until a statute authorizing him to maintain the action in this State was enacted, but that was an utterance unnecessary to the decision of the case. After that came the amendment of 1905, giving the right to sue to the person entitled to sue under the laws of the state or territory wherein the cause of action accrued, and expressly giving the right to the foreign executor or administrator. In Lee v. Railway, 195 Mo. 400, an action also brought before the amendment, it was held that the widow might prosecute the action which accrued under the laws of Kansas, the law of that state at that time permitting her to do so. It was said in the opinion, at page 420, that the action could not be prosecuted in this State by a foreign administrator. But, that question was not an issue in the case, because the plaintiff was entitled to sue as widow, by virtue of provisions of the Kansas law, and sued in that capacity. In

Casey v. Hoover and Bridge Co., 197 Mo. 62, the cause of action accrued in Oklahoma, and the action was prior to the amendment of 1905. The plaintiff undertook to sue in a three-fold capacity: by next friend, as widow, and as administratrix, she having been so appointed such in Oklahoma. In brief, it was held that she could not sue by next friend, the Oklahoma statute giving the right of action first to the administrator, and then to the widow; that she could not sue as widow, because having qualified as administratrix, she had, under the Oklahoma law, precluded herself from suing as widow; and she could not sue as administratrix, because not authorized by our statute, as it then was, to sue as a foreign administratrix. Reference was made, at page 68, to the then recent amendment of 1905.

Later Congress enacted the law under which this action falls, applicable to employees of all common carriers by railroad, while the carrier, and its employee, as such, were engaged in interstate commerce, giving a right of action to the personal representative of the deceased employee, for the benefit of certain relatives designated in their order as beneficiaries. By the amendatory Act of April 5, 1910, 36 Stat. p. 291, a change was made concerning the beneficiaries, and it was expressly provided that there could be but one recovery for the same injury. By the same amendment it was provided that in actions of this character, the jurisdiction of the courts of the United States should be concurrent with the jurisdiction of the courts of the several states, and that no case arising under the act and brought in any state court of competent jurisdiction should be removed to any court of the United States. There is thus disclosed a legislative policy among the states, severally pursued, providing a right of action which did not exist at common law, and a further legislative policy, severally pursued but generally similar in character, providing methods of remedy not known to the common law, followed by the Federal Act based upon the interstate commerce provision.

The Federal Employers' Liability Act, in respect of the right granted, and in the cases falling within its provisions, is a law of uniform and universal application in all of the states. In respect of enforcement of its provisions the remedy may be sought within either the Federal or State jurisdiction, in accordance with the course of procedure therein respectively provided. The immediate issue in the case at bar has not heretofore been presented to this court for decision. The question is whether Section 1163 governs, and is to be construed as authorizing the foreign representative of a right of action arising under the laws of any, among all the other states, to sue as such, in the courts of this State, but, as denying that remedy to the same representative asserting a right granted under a Federal law, which in respect of the cause of action granted and the party entitled to sue, supersedes the law of his state, and of this State as well. No reason for so holding is suggested except that Section 1163 applies inflexibly. Section 1163 has to do with the remedy in actions where the suit is authorized to be brought only in a representative capacity, and in cases where the beneficiaries are not authorized to sue as such. Its primary purpose was to remove the disability, to sue here, which had formerly existed against the representative designated in another state to maintain the action for the benefit of others, who were not allowed to sue for themselves anywhere. The essential intent was to make the availability of the remedy responsive to the character of that particular class of causes of action, wherever they might arise under the laws of any, or of all of the several states and territories.

The general rule is that an administrator cannot sue in his representative capacity in a state other than that in which he was appointed, in the absence of an authorizing statute in the state where he sues. This, under the principle that letters of administration have no extraterritorial force, and upon the other principle that to permit the foreign administrator to sue might result in the exhaustion or diversion of local assets of the estate

303 Mo. Sup.—26.

to the injury of local creditors. It is held everywhere, however, that a cause of action of the class here under consideration is not assets of the estate of the deceased, is not subject to the claims of creditors of the deceased, and is for the exclusive benefit of the persons designated as beneficiaries under the law which gives the right. [Jones v. K. C. Ry. Co., 178 Mo. l. c. 541; Miller v. Hoover, 121 Mo. App. 568; Kelly v. Railroad, 141 Mo. App. 490; Voris v. Railroad, 172 Mo. App. 125; Dennick v. Railroad, 103 U. S. 11; Railroad v. Babcock, 154 U. S. 190; Pearson v. Railroad, 286 Fed. 429; 24 C. J. p. 1130, sec. 2703.]

By the same authorities, and generally, it is held that the statute creating such a right of action makes the personal representative the trustee of an express trust. The power and the duty to enforce the right rest upon the personal representative, whoever he may be, and "he does so, not for the use of the estate in general, but for the use of the beneficiaries named; he is, in effect, created by the statute a trustee of an express trust for the use of the widow and next of kin." [Jones v. Railway, supra, l. c. 541.] The cause of action here arises under the Federal Act, and the party plaintiff is designated by the same law. The act supersedes all other laws upon that subject. [Second Employers' Liability Cases, 223 U. S. 53; St. Louis Railroad Co. v. Seale, 229 U. S. 156; Seaboard Air Line Ry. v. Horton, 233 U. S. 492.] "The laws of the United States are laws in the several states, and just as much binding on the citizens and courts thereof as the state laws are. The United States is not a foreign sovereignty as regards the several states, but is a concurrent, and, within its jurisdiction, paramount sovereignty. . . . Legal or equitable rights, acquired under either system of laws, may be enforced in any court of either sovereignty competent to hear and determine such kind of rights and not restrained by its constitution in the exercise of such jurisdiction." [Claflin v. Houseman, 93 U. S. l. c. 136-7, cited and quoted in Second Employers' Liability Cases, 223 U. S. 53.]

"The nation, on those subjects on which it can act, must necessarily bind its component parts." [McCulloch v. Maryland, 4 Wheat. 316.] In Hogarty v. Phila. Ry. Co., 245 Pa. St. 443, the court after summing up the holdings of the Supreme Court of the United States in the Second Employers' Liability cases, continuing, said the holding was: "That the provisions of the statute 'supersede the laws of the State in so far as the latter cover the same field,' that this piece of legislation must be heeded by all courts, that in its enforcement by state courts the act in question is 'not to be treated as a foreign statute,' but as one 'establishing a policy for all,' and, finally that the policy thus established is 'as much the policy of Connecticut (the state from which the appeal was taken) as if the act emanated from its own legislature.'"

The Pennsylvania court, referring to the case before it, further said, l. c. 452, that "since the Supreme Court of the United States has decided that this statute must be treated by State courts, in each instance, as though an act of their own Legislature, for all practical purposes it is a Pennsylvania Statute."

In respect of the nature of the cause of action, and of the official character or trust relation of the person by whom it must be prosecuted, both are created and controlled by the Federal Act, which is the law upon that subject in force in Arkansas—the only law on that subject which can be in force in that state, or in this State. Section 1163 cannot be held to govern so as to exclude a case founded upon a cause of action under a law which thus supersedes the law of the other state where the cause of action arose, and is not a law foreign to either state.

Section 1163 is regarded as inapplicable to exclude the right to sue, because it expresses a policy to allow the representative to sue upon this class of causes of action whenever such a cause of action has accrued within any of the other state or territorial jurisdictions of the United States, and the Federal Act is controlling as an expression of the constitutional power of Congress to

create the right of action, and to confer it upon whom it saw fit. The cause of action is not for the benefit of the estate. The representative does not hold it in his strict representative capacity as representing all the persons interested in an estate; but, being the representative, he becomes by virtue of the Act the trustee of a statutory express trust. The money he may recover is not to be administered, but is to be distributed, and not according to the law of the state of his appointment, or the order of a probate court, but in accordance with the Act. These various considerations are discussed in numerous cases. [Boulden v. Railway, 205 Pa. 264; Fugate v. Moore, 86 Va. 1045; Purple v. Whitehed, 49 Vt. 187; Connor v. Railroad, 28 R. I. 560; Voris v. Railroad, 172 Mo. App. 125; Pearson v. Ry. Co., 286 Fed. 429; McCarty v. Railroad, 62 Fed. 437; Stewart v. Railroad, 168 U. S. 445.]

The question is one of determination of the legal status of the plaintiff for the purposes of this suit. By "the supreme law of the land" the cause of action was given and the right of action thereon was vested in the personal representative. The particular person to be the representative was left to be appointed under the law of the state. When so appointed the representative becomes vested with all the rights given under the Federal Act, which, in all respects except the formal selection of the particular individual to be the representative, has become the law of the state of the appointment. This conclusion is clearly within the reasoning of this court in Sells v. Railroad, 266 Mo. 155, and in Thompson v. Railroad, 262 Mo. 468. In Sells v. Railroad, it was said in the concurring opinion by Graves, J., at page 189:

"This statute of the Federal Government placed persons engaged in interstate commerce into a class to themselves and created a right of action in case of death. As to persons falling within the class, this Federal law took the place of State statutes dealing with the same subject-matter. As to this class of persons it *pro tanto* repealed the State statutes. Such State statutes became

as ineffective, both as to rights and remedies, as they would have been had they been specifically repealed by the State.''

When Section 1163 was enacted the power of Congress had not been exercised upon this subject, but the power existed. When exercised it resulted in a law which took the place of the laws of the State covering the same subject. Section 1163 was enacted as an enabling statute, responsive to a policy then pursued severally by the states upon a certain subject. It ought not to be construed narrowly as a disabling statute in its relation to a law, universal and exclusive in effect upon that subject, to that extent taking the place of the laws of the states, enacted in the exercise of a power which always existed, and establishing a uniform policy in respect of right and of remedy. Upon this assignment we rule against defendant.

II. The remaining assignment is that the court erred in overruling the plaintiff's demurrer to the evidence at the close of the evidence, with which, defendant connects certain questions related to the allegations of the petition, and the primary instruction given for plaintiff.

The freight train, of which Floyd Wells was fireman, reached Woolsey, Arkansas, at 6:20 in the morning. There were twenty-five or thirty cars in this train. The crew had received orders for this train to take the side track at Woolsey, to permit the passage of a north-bound passenger train due at that place at 6:55 A. M. The freight train, headed south, was pulled onto the switch track a few feet west of the main line track. It was stopped by the engineer, when clear of the main line, pursuant to a signal given by the brakeman at the rear, but the engineer testified he did not know by what margin he was clear of the switch. No one was about the engine or front of the train except Wells, the fireman, and Bryson, the engineer. The engine had two sets of grates under the fire box. Beneath each set of grates there was a pan to receive the cinders and ashes when the grates were shaken. The grates could be shaken by the use of a shaker-bar in the

cab of the engine. The pans below, tapering down, hopper-fashion, held the cinders until they might be released at a place where there was no danger of their setting out fire. There was a hinged lid or false bottom to these pans. It was the duty of the fireman to shake the grates, and also to empty the pans. In emptying the pans the fireman stands upon the ground on the left side of the engine, and opens the bottom of the pan with a bar, and where they do not fall out, uses the bar to poke and loosen them. This engine had four driver wheels on each side. One pan was reached just to the rear of the rear driver wheel. The other pan was reached by inserting the bar between the two rear drive wheels, or by inserting the bar through the spokes of the next to the rear drive wheel.

The only witness testifying to what occurred at the time and at the immediate place was Bryson, the engineer, who was called by the plaintiff. According to his testimony, after the freight train had stopped on the side track, Wells inquired if there was time to clean the grates and empty the pans. Being told there was, Wells shook the grates from the cab. He then descended to the ground on the east or left side of the engine, taking with him the shaker-bar. He went to work on the rear pan, using the shaker-bar to loosen the cinders and ashes. He then stood at the back or north side of the rear drive wheel. Bryson also descended from the cab, took the clinker-hook and proceeded to the front pan to empty it. Wells succeeded in removing the ashes from the rear pan more rapidly than did Bryson from the front pan. When the ashes from the rear pan filled the space between the bottom of the pan and the ground, and it became necessary to move the engine in order that the cinders remaining might be let out, Wells so advised Bryson, and inquired whether he should move the engine himself, or whether Bryson would do so. Bryson answered that he would move it. Thereupon, Bryson says, Wells stepped back from the side of the engine three or four feet, and stood holding with his left hand one end of the shaker-bar, the other end resting upon the ground. Wells had

been using the end which was on the ground in poking the cinders. Bryson in going to the cab passed between Wells and the engine and climbed up into the cab on its left side. He had to start the engine from the right-hand side of the cab. He testifies that when he climbed up into the cab Wells was standing as has been stated; that when he went over to the right-hand side of the cab it was impossible to see Wells, and he did not see him again before he started the engine. He says he pushed the reverse lever forward, opened the throttle, started the engine and pulled forward, "four or five feet, not over that," applied the air, and stopped. In his direct examination he estimated that it took about one minute from the time he left his place on the ground until he moved the engine. When he got out of the cab he saw Wells lying on the ground with his head toward the north and his feet toward the south. His feet were three or four feet south of the spot where he stood when Bryson last saw him. Bryson says the feet of Wells were lying about even with the third driver wheel as the engine thus stood, after the movement. The shaker-rod lay about his feet. Wells was unconscious. He had a bruised place, three or four inches wide, on the side of his head, and a blue dented spot in his forehead, both as if made by a blunt instrument. The shaker-rod which Wells had used was bent somewhat at a point about a foot from the end used in poking the cinders in the pan. Bryson testified that there was a mark on the engine frame that was between the pan and the driver wheel, as if something had struck or jarred it; and also that there were marks on two or three spokes of the third driver wheel—the under side of the spokes—as if they had been bruised. The space between the frame where the mark was and the spokes of the wheel was about one foot.

The plaintiff introduced in evidence Rule No. 84 of the Book of Train Rules in force as follows: "A train must not start until the proper signal is given." Plaintiff also introduced Rule No. 30, under the head of Signals, from said Book of Rules, which read as follows:

"The engine bell must be rung when an engine is about to move." Bryson testified that these rules had been in force and effect since 1909; that when a new trainman, such as a fireman, went to work he was given a copy of the Book of Rules. He testified that before he moved the engine he did not sound the whistle and did not ring the bell. He further testified that he moved the engine forward because he could not see how far the rear end of the train was from the switch, and a backward movement might foul the main line; that if he had moved the engine backward he would have had to whistle a signal to the rear end of the back movement to be made.

The testimony of one of the brakemen at the rear was that the rear of the train was in the clear a car-length or more. Bryson testifying as to his understanding or interpretation of the two rules mentioned, said there was no rule requiring him to whistle at that time; that he did not think the rule requiring the bell to be rung when the engine was about to move required the engineer to ring the bell; that it was the fireman's duty to ring the bell. The following also was given by him:

"Q. When there is no fireman on the engine who rings the bell? A. When the bell is rung the engineer would ring it.

"Q. You know it is your duty to ring the bell when the fireman is not on the engine? A. I whistle; it is the same to whistle as to ring the bell."

He also testified: "Three blasts of the whistle is a notice to all the crew that you are going to back up; you wait to give a signal for the crew to back up. Two blasts of the whistle is a sign to go forward. The whistle cord is on my side, where I could reach it. The engine did not have an automatic bell ringer." Certain other points of the testimony will be noticed later.

The petition set forth the duty undertaken by the deceased fireman in reference to shaking the grates and cleaning and adjusting the ash pans and alleged that it was necessary for him to place the shaker-bar through the wheels or drivers and between the spokes to prop-

erly reach and adjust the grates and ash pans; that while he was doing so, and had the shaker-bar between the spokes, the engineer, stationed in his cab, "suddenly and without any warning or notice to plaintiff's said son whatever, opened the throttle and applied the steam," whereby "said engine suddenly started and the wheels thereof turned and spun around quickly and with great violence," and the shaker-bar was caught and thrown by the sudden movement of the wheels against the deceased, inflicting the injuries from which he died.   Following, the petition charges the death as being caused in whole or in part through the negligence of defendant and his employees, in that: "Plaintiff states that the death of her said son was directly caused and occasioned in whole or in part, through the carelessness and negligence of the said Director General, his agents, servants and employees; in that the engineer in charge of said locomotive suddenly started the same, and suddenly opened the throttle and applied the steam thereof so as to cause the said wheels and drivers to turn, without first giving any warning or signal, either by the bell or whistle on said locomotive or otherwise of his intentions to do so, in direct violation of law, and in direct violation of the rules of said railway company; that said engineer was further careless and negligent, in that he applied the steam on said locomotive so as to move the same and caused the wheels to turn, without first taking precaution to ascertain and know the position and attitude of plaintiff's said son, and in moving said drivers by the application of steam, without ascertaining the position of plaintiff's said son, and without any notice or warning to him whatever."

The answer, in addition to the plea challenging plaintiff's right to sue, consisted of a general denial.   At the close of plaintiff's evidence defendant offered a peremptory instruction as follows:

"The court instructs the jury that under the pleadings and the evidence offered on behalf of the plaintiff,

plaintiff is not entitled to recover and your verdict must be for the defendant.''

This was refused, and defendant, after excepting to the court's action, rested his case.

The court gave an instruction covering the measure of damages, and one other instruction for plaintiff, of which the part material to be considered here, is as follows: ''and if you find that it became necessary to move the engine and train for the purpose of completing the task of cleaning said ash pan, and if you find that it was the duty of the engineer in moving said engine or train to give warning by bell or whistle before moving same, and that the fireman under all the facts and circumstances had a right to expect and did expect that the engineer would give such signal by bell or whistle before moving said engine or train, and if you further find that said Wells, before the engine was started, undertook to continue the shaking or knocking down of the ashes by inserting the shaker-bar through the wheel of the locomotive, and that while attempting to do so the engineer started the engine ahead without giving such signal by bell or whistle, and that the spokes or other part of the wheel, or driver, caught and threw the shaker-bar in such a way as to strike the said Wells and that he was thereby killed, and if you further find that in failing to give such warning by bell or whistle the engineer did not use such care as an ordinarily prudent person would use under like or similar circumstances, then the defendant was guilty of negligence, and if you further find that such negligence, if any, directly caused, in whole or in part, the injury and death of the said Floyd Wells,'' etc.

The defendant asked and was given instructions numbered 3, 4, 5 and 6. Instruction 3 told the jury that if the injuries received were not the direct result of the failure of the engineer to sound the whistle or ring the bell before starting the engine, the verdict must be for defendant. Instruction 4 told the jury that the burden was on plaintiff to prove by the preponderance of the evidence that the deceased did not know that the engine

was to be moved at the time and in the manner in which it was moved. Instruction 5 told the jury that if the engineer, in response to a request by Floyd Wells to move the engine so that the latter might complete the cleaning of the ash pan, immediately got upon the engine, and moved it in compliance with said request, and that Floyd Wells had no reason to expect the engineer to give a warning by bell or whistle before actually moving the engine, the verdict must be for defendant. Instruction 6 told the jury that if Floyd Wells knew that the engine was to be moved at the time and in the manner in which it was moved, the verdict must be for defendant.

With these instructions respectively asked and given, the defendant, in support of his contention that the court erred in overruling the demurrer to the evidence, insists that the question is to be determined upon the sufficiency of the evidence to sustain the theory upon which plaintiff's case was submitted under her instruction given. It is urged that plaintiff is bound by her trial theory as set forth in the instruction. [O'Hara v. Gas Light Co., 244 Mo. 395.] Attention is called to the fact that the petition alleges a failure to sound the whistle or ring the bell, in violation of the rules of the railway company. It is urged that plaintiff's instruction abandons this theory and did not submit this issue, but submitted the case solely on the question of whether there was a breach of the common-law duty to warn by bell or whistle. It is said that the parties have confined the trial to this one issue, and having done so, the court on appeal will deal only with the submission of such issue. [White v. Pierce, 213 S. W. 512; Delano v. Roberts, 182 S. W. 773.] The demurrer was general and the ruling of the trial court thereon did not and could not disclose more than that, under all of the charges in the petition and under all of the evidence, the court held that plaintiff had a case for the jury. The defendant did not ask an instruction withdrawing any assignment of negligence, and did not stand upon his demurrer. The plaintiff's instruction required the jury to find "that it was the duty of the

engineer in moving said engine or train to give warning by bell or whistle before moving the same, and that the fireman under all the facts and circumstances had a right to expect and did expect that the engineer would give such signal by bell or whistle before moving said engine or train.'' Defendant's contention is that the violation of the rules was not submitted as negligence, and that the alleged violation cannot be complained of, nor the evidence on that subject considered here in determining the question whether the court erred, or whether there was a case for the jury. On the other hand plaintiff contends that the defendant by his general demurrer, followed by the instructions asked by him and given by the court, invited the verdict, and is estopped from saying there is no liability, and cites Torrance v. Pryor, 210 S. W. 430; Ramsey v. Railroad Co., 253 S. W. 1081; Leahy v. Winkel, 251 S. W. 483.

The defendant's instructions, except upon the issue of fact of whether at the time the engine was started the fireman had inserted the shaker-bar between the spokes to continue shaking out the ashes, presented severally and conversely the other essential questions which were conjunctively set forth in plaintiff's instruction. These were, that the injury was the direct result of the failure of the engineer to sound the whistle or ring the bell, that the deceased did not know that the engine was to be moved at the time and in the manner it was moved, and that the deceased had no reason to expect that the engineer would give warning by bell or whistle before actually moving the engine at the time and manner in which it was moved. Without going into the question of the applicability of the holding in Torrance v. Pryor and the other cases cited, to this case, it seems clear that under the situation here under these instructions, the whole of the evidence is to be considered upon the question of the duty of the engineer to give warning by bell or whistle. This is so, because it was and is necessary to consider what the deceased was presumed to know, or had reason to expect, in reference to warning by bell or whistle under all the

circumstances. While the instruction did not present the specific issue of violation of the rules, as negligence, and no specific finding to that effect was made, the instructions together presented the issues of duty on the part of the engineer, to warn by bell or whistle—a subject with which the rules had to do—and on the other hand the issue of what the fireman knew, or had reason to expect from him to do, in that regard and under these circumstances. They were men of experience in their respective positions, and a copy of the rules was a part of the equipment of each.

Coming then to certain features of the evidence not heretofore noticed: The injury occurred at about dawn on December 2nd, and the weather was cloudy and wet. As to the manner of starting the engine, the engineer testified:

"Q. Did you pull the throttle clear open? A. Pulled it pretty well open.

"Q. And when you did that what movement, if any, was there of the engine and train? A. A quick movement.

"Q. And it moved in which direction? A. It moved ahead or south.

"Q. What did you do to stop it? A. I set the automatic brake.

"Q. How far did you move? A. Four or five feet, not over that.

"Q. Wouldn't the engine and train have stopped by shutting off the steam without applying the air? A. It wouldn't have stopped so quick.

"Q. It was going up hill? A. Yes, sir.

"Q. What was the purpose of stopping so quick? A. We wanted to stop. We didn't want to pull far up. If we pulled too far up we would have to carry our tools up ahead.

"Q. When Mr. Wells spoke about moving the engine he didn't say which way to move it? A. No, sir.

"Q. Was there anything to have prevented your moving the engine backwards instead of forward? A. It

wasn't policy to move back, because I didn't know how far we were clear of the main track.''

At another point in his testimony the engineer testified: ''If I had moved it (the engine) back I would have had to whistle a signal to the rear end to move the train back. That is the purpose of the signals in the rules, is to notify the fellows on the back end if you are going to move that way.'' In his direct examination the engineer testified that he estimated it was one minute from the time he started to go to move the engine until he had moved it and came out of the cab. On his cross-examination by defendant he gave this testimony:

''Q. So this accident happened, the train moved, and the accident happened, and you got on the engine and off the engine, all within two minutes? A. It wasn't over three minutes.

''Q. From the time you started until you got back on the ground? It took you longer to get up and come back than it did to move the engine? A. Yes, sir.''

In connection with the testimony of the engineer as to his manner of opening the throttle and starting the engine, certain testimony given by Alsup, the rear brakeman, may be noted, as set forth in respondent's additional abstract, as follows:

''Q. Considering that morning, the engineer stops, with the track damp and wet, a drizzling morning, the engineer gets up and opens up his throttle for a forward movement, up grade, with your tonnage, what effect would that have upon the drivers? A. Well, as I understand the question, it depends on how he opened the throttle. How much steam he gave it.

''Q. Practically throw it open? A. Well, by observation, of course I am not a locomotive expert, but by observation, if you open a throttle wide that way to start with, the engine (interrupted).

''Q. What does it do? Suppose he opens it under these conditions mentioned, practically opened the throttle? A. Well, I didn't say so.

"Q. I am putting this question to you. If you did that on that kind of a track, what effect would that have on the drivers? A. They would most likely spin if he opened it wide.

"Q. They don't make the proper revolutions? A. Kind of like a top.

"Q. The engine don't go forward? A. That is what I mean.

"Q. And does that quickly? A. Yes, sir."

Upon the question whether Wells, at the time the wheels of the engine started to turn, was undertaking to poke the ashes into the front pan, the defendant insists that the evidence is insufficient, and is as consistent with the idea that he merely let the shaker-rod fall against the driver wheel and was struck in that way. But this contention is not borne out by the facts shown. Wells had the end of the rod, used against the pan, resting upon the ground, when the engineer passed him, and was holding the other end in his left hand. The rod was not bent before the injury. After the injury there was found a bend in the rod about one foot from the end which had been on the ground, and which was the end used against the grates and the pan. The marks on the engine frame inside the driver, and near the front pan, were about one foot from the spokes of the driver wheel on which there were also marks. The testimony was that the position of the body of Wells when he was found was further south than it was where he had stood when the engineer passed him, and indicated that he had moved south near the front pan and the driver wheel, third from the south, or second from the rear. It was the work of the fireman to get down the ashes coming into the front pan, the engineer had merely volunteered to help, by working at that pan, and had not proceeded as far as Wells had upon the rear pan. The question whether Wells was using the shaker-rod to shake down the ashes at the time the engine was started was a question for the jury under the evidence.

The defendant insists that Wells having requested the train to be moved and being in a position of safety, the engineer was warranted in presuming that he would

not suddenly and without manifestation of his intention change into a position of danger, and cites Maginnis v. Railroad, 268 Mo. 667; King v. Railroad, 211 Mo. 1; Dyrcz v. Railroad, 238 Mo. 33; Guyer v. Railroad, 174 Mo. 344, 349. The allowance of this presumption depends upon whether it was the known duty of the engineer before moving the train at the time and in the manner in which he did to give warning by bell or whistle and upon whether Wells had reason to expect that such warning signal would be given. This issue was embodied in Instruction 5, given for defendant. We are of the opinion that it cannot be conclusively presumed under the evidence in this case that there was no known duty to warn, and hence no reason to expect that the movement would be made without a warning in this instance, by sounding the whistle. The engineer testified:

"Q. When there is no fireman on the engine, who rings the bell? A. When the bell is rung the engineer would ring it.

"Q. You know it is your duty to ring the bell when the fireman is not on the engine? A. I whistle; it is the same to whistle as to ring the bell."

It is urged that it is not negligence to fail to take precautionary measures to prevent an injury, which if taken would have prevented it, when the injury could not reasonably have been anticipated and would not have happened unless under exceptional circumstances, under the rule stated in State ex rel. Lusk v. Ellison, 271 Mo. 463; Fuchs v. St. Louis, 167 Mo. 620; American Brewing Assn. v. Talbot, 141 Mo. 674. The application of the rule depends upon the circumstances in the particular case. If the precautionary measure is one regularly required, and therefore to be expected before committing the act which results in the injury, the rule that the omission of the precautionary measure is not negligence would not apply.

Again, it is urged that the failure to warn is not, as to one who knows the danger, negligence. This rule is stated in Gubernick v. Railroad, 217 S. W. 33; Murray v. Transit Co., 176 Mo. 183, and other cases cited. The argument

here is that the deceased knowing that the train was to be moved as and when it.was moved, the failure to warn was not the proximate cause of his death. The question whether the deceased knew that "the engine was to be moved at the time and in the manner in which it was moved," was submitted under defendant's instruction numbered 4. The jury was told by the instruction that plaintiff could not recover if the deceased so knew. That deceased knew that the engine was to be moved is undoubted, but the evidence does not equally show that he knew it would be moved without any signal first given, forward, upgrade, in "a quick movement," the throttle "pulled pretty well open," whereby, as some evidence tends to show, the wheels were, or might be, caused to spin around. Nothing was said between them as to the direction of the movement.

In Stuart v. Dickinson, 235 S. W. 446, the question of recovery was submitted upon the issue of violation of the rules, of which there were many. Evidence was introduced in the nature of an interpretation of them by the employees. This court said at page 458: "The rules in question, however, constituted a written contract between the receiver and his employees; their construction, therefore, devolved exclusively upon the court." The rules in that case were somewhat complicated, and inter-related. In this case the rules were short, positive and apparently unequivocal. They were not construed by the court. Their force and meaning, and the interpretation put on them by the engineer, were left to the jury under the issue of whether it was defendant's duty to warn by bell or whistle before starting the engine and train. Defendant's instructions left it to the jury to find under the evidence whether the deceased knew, or had reason to expect, that warning by bell or whistle would be given. Under this manner of submission and under defendant's instructions it is not perceived how a consideration of these rules was excluded, and especially so upon the question as to what deceased had reason to expect. Defendant's instructions left that question to the jury without under-

taking to withdraw or exclude consideration of any of the evidence introduced.

Under this view it is held that the court did not err in overruling defendant's demurrer to the evidence.

No point is made here upon the instruction on the measure of damages, or the amount of the judgment as reduced.

The judgment is affirmed. *Small, C.,* concurs.

PER CURIAM:—The foregoing opinion of LINDSAY, C., is adopted as the opinion of the court. All of the judges concur.